# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**11/22/2013**

| | | |
|---|---|---|
| **IN RE:** | § | CASE NO. 12-36805 |
| **TERRABON, INC., ET AL.** | § | |
| **Debtors.** | § | JOINTLY ADMINISTERED |
| | § | |
| **RONALD J. SOMMERS,** | § | |
| **CHAPTER 7 TRUSTEE** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | ADVERSARY NO. 13-03069 |
| | § | |
| **COMERICA BANK, N.A., d/b/a** | § | |
| **STERLING BANK** | § | |
| **Defendant** | § | |

## MEMORANDUM OPINION REGARDING COMERICA BANK'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56[1]
[Adv. Doc. No. 25]

### I.   INTRODUCTION

The Court writes this Memorandum Opinion to underscore how tenuous the corporate shield can be when one individual is CEO of both the parent and its subsidiary. Unfortunately, for the Chapter 7 trustee in this suit, this porous shield dooms his cause of action.

In the above-referenced adversary proceeding Ronald J. Sommers is the Chapter 7 Trustee (the Trustee), who is standing in the shoes of the debtor[2], Terrabon, Inc. (the Debtor). On May 24, 2013, the Trustee filed an Amended Complaint seeking relief pursuant to 11 U.S.C. §§ 506(d) and 551[3] from Comerica Bank (Comerica), a creditor, for the purpose of declaring

---

[1] Rule 7056 of the Federal Rules of Bankruptcy Procedures applies FED. R. CIV. P. 56(c) to adversary proceedings.

[2] *See, e.g.*, *In re Jim Ross Tires, Inc.*, 379 B.R. 670, 674 (Bankr. S.D. Tex. 2007) ("It is a well-accepted principle that when an entity files for bankruptcy and a trustee is appointed, the trustee 'stands in the shoes' of the debtor.").

[3] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

Comerica's security interest void and to preserve Comerica's alleged void security interest for the benefit of the Debtor's bankruptcy estate (the Trustee's Claim). [Main Case[4] Doc. No 109; Adv. Doc. No. 17]. On August 16, 2013, Comerica filed a Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 (the Motion), requesting that the Court grant final summary judgment against the Trustee's Claim. [Adv. Doc. No. 25]. On September 6, 2013, the Trustee filed a Response to the Motion [Adv. Doc. No. 34] and then amended it on September 9, 2013 [Adv. Doc. No. 37] (the Response). Subsequently, on September 16, 2013, Comerica filed a reply to the Response. [Adv. Doc. No. 43]. Having considered the pleadings and applicable law, this Court finds that the Motion should be granted. This Memorandum Opinion sets forth the reasons for this ruling.

## II.  FINDINGS OF FACT

The relevant facts, as established by the pleadings and affidavits, are as follows:

1. On August 5, 2011, the Debtor transferred $170,000.00 from its checking account for the purpose of opening a certificate of deposit account numbered 215167 (the CD) in the name of the Debtor's subsidiary, Terrabon Research Company, LLC (the Subsidiary).

2. On August 8, 2011, the Subsidiary assigned, transferred, and pledged all of its interest in the CD to Comerica as security for the Subsidiary's present and future indebtedness to Comerica (the Assignment).

3. Gary Luce, the chief executive officer and agent of the Subsidiary, executed the Assignment on the Subsidiary's behalf. Gary Luce also serves as the chief executive officer of the Debtor.

4. On August 12, 2011, Comerica issued a $170,000.00 letter of credit (the Letter of Credit) on the Subsidiary's behalf to the Subsidiary's landlord, CWCS 2, LP (the Landlord).

---

[4] Any reference to "Main Case" is to main case number 12-36805.

5. On September 7, 2012, both the Debtor and the Subsidiary filed voluntary petitions under Chapter 7 of the Bankruptcy Code. Their cases are jointly administered with four other entities under main case number 12-36805. The Debtor scheduled the CD as an asset of its estate; the Subsidiary did not. *Compare* [Main Case Doc. No. 1, p. 19] *with* [Main Case No. 12-36810, Doc. No. 1, pp. 21–33].

6. At the time of the bankruptcy filings, the Landlord had made no draw on the Letter of Credit; however, the Landlord formally called on the Letter of Credit on January 23, 2013, and Comerica honored the call and disbursed the amount to the Landlord.

7. On March 11, 2013, Comerica filed a Motion for Relief from the Automatic Stay so that it could apply the CD against the Subsidiary's indebtedness created by the Landlord's post-petition demand on the Letter of Credit. [Main Case Doc. No. 95].

8. The Trustee objected to Comerica's Motion for Relief to the Automatic Stay [Main Case Doc. No. 104], and on April 7, 2013, the Trustee filed a complaint seeking a judgment declaring the security interest of Comerica Bank void and seeking to preserve the alleged void security interest for the benefit of the bankruptcy estate of the Debtor. [Main Case Doc. No. 109].

### III.   CONCLUSIONS OF LAW

**A.   Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order**

1. Jurisdiction

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334 and 157(a). This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of the Debtor's Chapter 7 estate; 28 U.S.C. § 157(b)(2)(K) because it concerns the validity, extent, or priority of liens; and the general "catch-all" language of 28 U.S.C. §

157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

   2. Venue

Venue is proper pursuant to 28 U.S.C. § 1409(a).

   3. Constitutional Authority to Enter a Final Order

The Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), recognized certain limitations on bankruptcy courts' authority to enter final orders.  In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate— is an unconstitutional delegation of Article III authority to bankruptcy judges.  *Id.* at 2616.  The matter at bar is not a counterclaim of the Debtor's estate based solely on state law.  On the contrary, this matter arises from Sections 506(d) and 551 of the Code, which are both express provisions of federal bankruptcy law.  This dispute is therefore distinguishable from the dispute in *Stern*, and this Court is constitutionally authorized to enter a final order.

**B.     Summary Judgment is Appropriate under the Circumstances**

   1. The Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is material only when it might affect the outcome of the suit under the governing law, and a fact is genuinely in dispute only if a reasonable finder of fact could return a verdict for the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Moore v. Willis Indep. School Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

The court must view the evidence in the light most favorable to the nonmoving party. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* Overall, the standard for summary judgment "mirrors that for judgment as a matter law" and the Court must "review all of the evidence in the record, but make no credibility determinations or weigh any evidence." *Moore*, 233 F.3d at 874.

"What otherwise might be a question of fact, such as ownership of a CD, becomes one of law when the facts are not in dispute or are conclusively established." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("Where the facts and circumstances are admitted or clearly established . . . the question becomes one of law."); *see also Zurita v. SVH-1 Partners, Ltd.*, No. 03–10–00650–CV, 2011 WL 6118573, at *4 (Tex. App.—Austin Dec. 8, 2011, pet. denied). Furthermore, Texas courts have held that "where facts surrounding the transaction are uncontested, ownership issue is a legal question." *Hudson Buick v. Good*, 7 S.W.3d 191, 195–96 (Tex. App.—Tyler 1999, pet. denied) (finding that automobile's ownership was a question of law for the court to determine based upon the established facts); *see also Smith v. Allstate Ins. Co.*, 467 F.2d 104, 106 (5th Cir. 1972) ("[T]he question of automobile ownership may be both factual and legal . . . [but where] the only contested issue is the legal effect of the Texas Certificate of Title Act upon the transfer in question [the transfer in question is] inappropriate for jury consideration.").

2. The Rights in the CD are a Question of Law

The Trustee asserts, contrary to Comerica's position, that the Debtor is the sole owner of the CD and that, given the dispute over this issue, the issue of ownership itself is "not yet ripe" for summary judgment. [Adv. Doc. No. 37, pp. 2–4, ¶¶ 2 & 8]. The Trustee supports his assertion of ownership with the following documents: (1) Schedule B filed by the Debtor, scheduling the CD as an asset of the Debtor's estate [Finding of Fact No. 5]; (2) Schedule B filed by the Subsidiary, which fails to list the CD as an asset of the estate [*Id.*]; (3) Comerica's Response to Trustee's Motion to Compel where Comerica stipulates that the Debtor provided the funds to open the CD [Adv. Doc. No. 31, p. 2, ¶ 3]; and (4) Trustee's Declaration [Adv. Doc. No. 37, p. 4, ¶ 9; Adv. Doc. No. 37-1]. The Trustee argues that additional discovery, via depositions of corporate representatives of Comerica and insiders of the Debtor and the Subsidiary, is necessary to resolve the issue of which entity—the Debtor or the Subsidiary—owns the CD. [*See* Adv. Doc. No. 37].

Comerica does indeed contend, in the first instance, that the Subsidiary owns the CD. [*See* Adv. Doc. No. 25, pp. 6–7, ¶¶ 21–25]. However, in the alternative, Comerica argues that even if the Debtor, not the Subsidiary, actually owns the CD, nevertheless the Subsidiary had sufficient rights in the CD so as to be able to convey a security interest. [*Id.* at pp. 7–9, ¶¶ 26–28]. In support of its alternative position, Comerica presents additional documents to show that the Subsidiary, at a minimum, had sufficient rights in the CD so as to be able to convey a security interest. These exhibits include documents that identify the Subsidiary as "account owner" of the CD and do not reference the Debtor, the assignment document, the letter of credit, and the formal call on the letter of credit (the Loan Documents). [Adv. Doc. No. 25, p. 7, ¶ 23; Adv. Doc. No. 25-1].

6

This Court concludes that, for the reasons set forth below, it does not need to reach the question of who actually owns the CD. Rather, the Court need only make a determination as to whether the Subsidiary had sufficient rights in the CD so as to be able to convey a security interest to Comerica. Whether the Subsidiary had sufficient rights in the CD is a pure question of law. The documents that the parties have submitted are more than sufficient to make this legal determination.

### 3. The Loan Documents Fall under the Business Records Hearsay Exception

Comerica presents the Loan Documents in support of the Motion, and it authenticates the Loan Documents with the Declaration of David Feree (the Feree Declaration). [Adv. Doc. Nos. 43 & 38-1]. The Trustee argues that the Loan Documents should be disregarded as not competent summary judgment evidence because they were not properly authenticated and incapable of being produced as admissible evidence under Federal Rule of Civil Procedure 56(c)(2). [Adv. Doc No. 37 at 5 ¶10]; *see* FED. R. CIV. P. 56(c)(2). Comerica vigorously opposes this argument and contends that the Loan Documents qualify for the business records exception to hearsay under Federal Rule of Evidence 803(6). [Adv. Doc. No. 43 at 4 ¶10]; *see* FED. R. EVID. 803(6).

Federal Rule of Evidence 803(6) (Rule 803(6)) provides an exception to the rule against hearsay for "Records of a Regularly Conducted Activity." FED. R. EVID. 803(6). Rule 803(6) states that:

> A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by . . . someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity . . . ;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) . . .; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

*Id.* Federal Rule of Evidence 902(11), in turn, provides a list of items of evidence that are self-authenticating and do not require extrinsic evidence of authenticity.  This list includes:

> (11) *Certified Domestic Records of a Regularly Conducted Activity*. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian *or another qualified person* that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

FED. R. EVID. 901(11) (emphasis added).

The Loan Documents qualify for the business record exception.  First, the conditions set forth in subsections (A) – (C) of Rule 803(6) are all satisfied by the Feree Declaration.  The Feree Declaration confirms that: (A) Comerica's records were made at or near the time of the transaction by an employee with personal knowledge; (B) Comerica's records were kept in the regular course of business; and (C) it is the regular course of Comerica's business to keep such records.  [Adv. Doc. No. 38–1, p. 1; ¶ 3]; *see e.g. United States v. Lawrence*, 276 F.3d 193, 196 (5th Cir. 2001) (holding that the district court properly relied on the promissory notes and assignment documents in granting summary judgment).  Second, Rule 803(6)'s (A) – (C) conditions are shown by a certification of a qualified person because Mr. Ferree is the Vice President of Comerica, and in that capacity is responsible for the management of lending transactions and collections; furthermore, he is the custodian of records for Comerica with respect to its loan documents.  [Adv. Doc. No. 38-1, p. 1 ¶¶ 2–3].  Third, the Ferree Declaration serves as reasonable written notice of the intent to offer the record and makes such record available for inspection, thereby giving the Trustee an opportunity to challenge the record as mandated by Federal Rule of Evidence 901(11).  Lastly, the Trustee does not contest the

competency of the Ferree Declaration, and this Court is within its discretion to rely upon it. *See U.S. v. Lawrence*, 276 F.3d at 196.   In sum, the Loan Documents, although hearsay, are admissible as evidence because they fall under the business records exception to hearsay under Rule 803(6).

**C.     Rights, or the Power to Transfer Rights, in the Collateral**

Whether the Assignment gives Comerica a security interest in the CD is governed by Texas state law. *See AmeriCredit Fin. Servs. v Tompkins*, 604 F.3d 753, 757–58 (2d Cir. 2010) ("Property interests are created and defined by state law; [u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.") (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).   Under section 9.203(b)(1)-(3) of the Texas Business and Commerce Code (the TBCC), a security interest attaches to collateral only if: (1) value has been given; (2) the debtor has rights in the collateral *or the power to transfer rights in the collateral to a secured party*; and (3) the debtor has authenticated a security agreement.   TEX. BUS. & COM. CODE § 9.203(b)(1)–(3)(A) (emphasis added).   Here, the first element is satisfied because Comerica gave value for the collateral by issuing the LOC [Findings of Fact Nos. 2 & 4]; moreover, the third element is satisfied because the Subsidiary executed the Assignment, thereby purporting to grant Comerica a security interest in the CD [Finding of Fact No. 2].   The only remaining issue is whether the Subsidiary had ownership "rights" or "the power to transfer rights" in the CD, so that it could grant a security interest to Comerica.

Although one cannot generally encumber the property of a different entity, there are certain exceptions.   The TBCC does not equate a party's "rights in collateral" with its possession of legal title to it; stated differently, a party need not have legal title to the collateral in order to

properly grant a creditor a security interest. *See Zurita v. SVH-1 Partners, Ltd.*, No. 03–10–00650–CV, 2011 WL 6118573, at *5 (Tex. App.—Austin Dec. 8, 2011, pet. denied) (stating that the phrase, "or the power to transfer rights in the collateral to a secured party," fosters exceptions to the rule that generally a security interest attaches only to the debtor's broad rights) (citing TEX. BUS. & COM. CODE § 9.203(b)(2) cmt. 6); *see also U.S. Small Business Admin. V. Guar. Bank & Trust Co. (In re Whatley)*, 874 F.2d 997, 1004 (5th Cir. 1989) (interpreting Mississippi law—identical to the relevant TBCC section—and holding that the bankruptcy court erred by equating the debtor's rights in collateral with its possession of legal title); *see also In re WL Homes, LLC,* 452 B.R. 138, 145 (Bankr. D. Del. 2011) (same).  Courts generally recognize that legal title is not mandatory and that "rights in the collateral" may be sufficient to give rise to an enforceable security interest if the legal title owner either: (1) <u>consented</u> to another's use of the collateral as security; or (2) <u>is estopped</u> from denying the creation of the security interest because the legal owner allowed the other party "to appear as the owner, or as having full power of disposition over the property, so that an innocent person is led into dealing with such apparent owner." *Zurita*, 2011 WL 6118573 at *5 (emphasis added); *see also In re Whatley*, 874 F.2d at 1004; *In re WL Homes,* 452 B.R. at 142 (citing *Merchants Bank v. Atchison (In re Atchison)*, 832 F.2d 1236, 1239 (11th Cir. 1987)); *K.N.C. Wholesale, Inc. v. Awmco, Inc.*, 56 Cal. App. 3d 315, 318–19 (1976) ("[A] debtor who does not own collateral may nonetheless use the collateral for security, thereby obtaining 'rights in the collateral,' when authorized to do so by the actual owner of the collateral").  In the suit at bar, this Court finds that either of these exceptions independently establishes that the Subsidiary had sufficient rights in the CD for the purpose of granting a security interest to Comerica.

1. The Debtor Consented to the Subsidiary's Exercise of Control over the CD

The legal owner of collateral may give consent for the use of the property as collateral himself or through an agent; and a court may infer such consent from the circumstances. *In re WL Homes, LLC,* 452 B.R. 138, 146 (Bankr. D. Del. 2011). Under Texas agency law, "[a]gency is a legal relationship created by an express or implied agreement or by operation of law whereby the agent is authorized to act for the principal, subject to the principal's control." *Schrum v. Land,* 12 F. Supp. 2d 576, 581 (S.D. Tex. 1997) (quoting *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1296 (5th Cir. 1994)). "In determining the principal's vicarious liability, the proper question is not whether the principal authorized the specific act, but whether the agent was acting within the *scope* of the agency at the time of committing the act." *Id.* (citing *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 99 (Tex. 1994)). Therefore, "[a] principal is liable for its agent's acts when the agent has actual, implied, or apparent authority to commit those acts, or when the principal ratifies them." *Id.* (citing *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no writ)); *see also Knowles v. N. Tex. Traction Co.*, 121 S.W. 232, 240 (Dallas 1909, writ dism'd) ("[A] corporation, like an individual, may be bound by the act of its agent acting within the scope, express or implied, of his authority as such.").

Because the evidence shows that Gary Luce, the chief executive officer of both the Debtor and the Subsidiary, executed the Assignment documents on behalf of the Subsidiary, and that he did not act with actual or implied authority from the Debtor,[5] the only way to accredit his actions to the Debtor is by way of his apparent authority. [*See* Finding of Fact No. 3].

---

[5] "Implied authority exists where there is no proof of express authority, but appearances justify a finding that the agent somehow was authorized to act, *i.e.*, there is circumstantial proof of actual authority." *Schrum v. Land*, 12 F. Supp. 2d 576, 585 (S.D. Tex. 1997) (internal quotation marks omitted). "There can be no implied authority in the absence of express authority, because authority is implied to enable the agent to perform the transaction or acts

"Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling." *Schrum v. Land*, 12 F. Supp. 2d 576, 586 (S.D. Tex. 1997) (citing *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985)).  In order to establish apparent authority, a party must show that "a principal either knowingly permitted an agent to hold itself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952–53 (Tex. 1996) (citing *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)).  Apparent authority is created as to a third person by the principal's conduct that would result in a reasonably prudent person's belief that the principal consents to the act done on his behalf by the agent.  *Id.* at 953 (citing *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981)).  A court may consider *only* the conduct of the *principal*— whether act or omission—leading a third party to believe that the agent has authority or a manifestation that the principal should realize would be likely to create such a belief.  *See id.* (citing *Sw. Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425, 428 (Tex. 1977)).  An indicator of apparent authority—present here and usually relied upon by courts—is "evidence of conduct by the principal *relied upon by the party asserting the estoppel defense* which would lead a reasonably prudent person to believe an agent had authority to so act." *Schrum*, 12 F. Supp. 2d at 586 (quoting *Ames*, 672 S.W.2d at 450)).

For instance, the Fifth Circuit, in *In re Whatley*, considered similar circumstances where a debtor corporation, Whatley Farms, Inc., pledged farm equipment as collateral for a loan.  *U.S. Small Bus. Admin. v. Guar. Bank & Trust Co. (In re Whatley)*, 874 F.2d 997, 998 (5th Cir.

---

expressly delegated to it by the principal." *Id.* (citing *Behring Int'l, Inc. v. Greater Houston Bank*, 662 S.W.2d 642, 649 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd by agr.)).  Because Mr. Luce executed the Assignment on behalf of the Subsidiary [Finding of Fact No. 3], he was not acting with express or implied authority on behalf of the Debtor.

1989).[6]  In this case, John Whatley operated Whatley Farms, Inc., and Whatley Farms utilized farming equipment personally owned by Mr. Whatley. *Id.* at 999.  In 1981, Whatley Farms borrowed $158,600.00 from the Small Business Administration (the SBA) and executed a security agreement and UCC-1 financing statement providing for a floating lien on all machinery and equipment, including the farming equipment. *Id.*  Several years later, John Whatley obtained a personal loan from Guaranty Bank and he granted the bank a security interest in the same farming equipment. *Id.*  In 1984, John Whatley filed a voluntary Chapter 11 petition and Whatley Farms followed with a separate voluntary Chapter 11 petition. *Id.*  A priority dispute arose between SBA and Guaranty Bank. *Id.*  The bankruptcy court held that Whatley Farms never actually owned the equipment and therefore could not grant a security interest thereon, but the Fifth Circuit disagreed and began its analysis by finding that the issue is "more complex" than a mere resolution of legal ownership. *Id.* at 1000–04.  Similar to the circumstances in the suit at bar, Mr. Whatley signed the corporate resolution authorizing the corporation (i.e., Whatley Farms, Inc.) to submit a loan application to the SBA and pledge the farming equipment as security on behalf of Whatley Farms. *Id.* at 1004.  Because John Whatley actually owned the equipment personally, the Fifth Circuit found this dual capacity to be important and held that "by signing the corporate borrowing resolution and security agreement, John Whatley consented to the corporation [act of pledging] the farming equipment." *Id.*  The Fifth Circuit then concluded that "[t]he corporation accordingly had sufficient rights in the collateral irrespective of outright ownership." *Id.*

---

[6] Although the Fifth Circuit is interpreting Mississippi law, section 9.203(b)(1)–(3)(A) of the TBCC is virtually identical to section 75-9-203(b)(1)–(3)(A) of the Mississippi Code. *Compare* Tex. Bus. & Com. Code § 9.203(b)(1) –(3)(A) *with* Miss. Code Ann. § 75-9-203(b)(1)–(3)(A) (West 2013).

A Texas appellate court also reached a similar conclusion by interpreting Texas law in *Zurita v. SVH-1 Partners, Ltd.*, No. 03–10–00650–CV, 2011 WL 6118573, at *1 (Tex. App.— Austin Dec. 8, 2011, pet. denied).

In *Zurita*, a landlord and its tenant, Zurita, executed a commercial lease for a shopping center space in Austin. *Id.* at *2. The lease granted the landlord a lien on certain personal property located on the premises. *Id.* at *3. AZR, a subsidiary of Zurita, operated the premises, purchased all the property on the premises and held legal title to it. *Id.* at *3–4. When Zurita defaulted, the landlord attempted to exercise its rights under the lease. *Id.* at *5. In the subsequent lawsuit, Zurita claimed that AZR held legal title to the property and therefore the security interest granted to the landlord by Zurita had not attached to the property. *Id.* at *6. The court held that "the security interest granted to the [l]andlord was not strictly limited to the property to which Zurita held legal title." *Id.* at *5. Rather, "the security interest also covered [the property] on the leased premises that Zurita had the authority to pledge as security" because the owner, AZR, gave permission to Zurita to use the property as collateral. *Id.* The Court found that "[t]his conclusion was consistent with the purposes of and goals of the [UCC], which was designed, in part, 'to prevent hidden-title subterfuge in which the true owner of collateral, by permitting another party to exercise an outward appearance of ownership, could deceive third-party creditors to their detriment.'" *Id.* (citing *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396, 399 (10th Cir. 1983)).

Other courts have also found this line of reasoning persuasive. For example, in *In re WL Homes*, the Delaware bankruptcy court resolved the issue of the ability of a parent company/debtor, WL Homes, LLC, to grant a security interest in an asset owned by its subsidiary/nondebtor, JLH Insurance Corporation (JLH), and the extent to which a third party,

Wachovia Bank, could enforce such a security interest. *In re WL Homes, LLC,* 452 B.R. 138, 140 (Bankr. D. Del. 2011). In that case, WL Holmes capitalized its subsidiary, JLH, by depositing $10 million into a bank account (the JLH Account). *Id.* at 141. Later, WL Holmes granted a security interest to Wachovia Bank in the JLH Account in exchange for a loan. *Id.* Upon commencement of bankruptcy proceeding, Wachovia moved for summary judgment seeking an order that it had an enforceable security interest in the JLH Account. *Id.* The court found that WL Homes had sufficient rights in the JLH Account to satisfy the UCC requirement for attachment of its security interest in part because JLH consented to WL Homes' use of the JLH Account as collateral. *Id.* at 145. The court reasoned that the resolution of the issue "turn[ed] on the legal significance that should be accorded to the actions of an agent of both the parent and the subsidiary, wearing multiple hats and presumptively acting on behalf of both entities." *Id.* at 140. Wayne Stelmar, who at all relevant times was the CFO of WL Homes and president of JLH, signed the loan documents on behalf of WL Homes. *Id.* at 141, 147. The court found that "his concurrent position as president of JLH [could not] be overlooked" and that his knowledge of WL Homes' pledge of the JLH Account as security to Wachovia "may be properly imputed to JLH, such that JLH [was] chargeable with Mr. Stelmar's knowledge as of such pledge." *Id.* at 147. Furthermore, the court considered Mr. Stelmar's signature on behalf of WL Homes as further evidence of his consent to such an arrangement on behalf of JLH as well. *Id.* The court concluded that under the doctrine of apparent authority, "Wachovia was entitled to believe that Mr. Stelmar had the requisite authority to consent to and reaffirm WL Homes' pledge of the JLH Account on behalf of JLH." *Id.*

Finally, the Eleventh Circuit has also taken a similar view. In *In re Atchison,* 832 F.2d 1236 (11th Cir. 1987), Estil Atchison, an officer and shareholder of A&W Woodyard, Inc.

(A&W), executed a chattel mortgage on behalf of A&W for the benefit of Merchants Bank. *Id.* at 1237. After Atchison filed for Chapter 7 relief, the bankruptcy court held that because he— not A&W, in whose name the security agreement was signed—owned the equipment, the security agreement was invalid and Merchants Bank held no enforceable security interest. *Id.* The bankruptcy court relied on Atchison's testimony that he never intended to grant a security interest in equipment he owned personally. *Id.* The Eleventh Circuit, interpreting Alabama's Commercial Code (which is identical in this instance to the UCC and TBCC), disagreed. *Id.* at 1238–39. The Eleventh Circuit emphasized that the bankruptcy court should have excluded the testimony under the parol evidence rule, because the security agreement was unambiguous. *Id.* at 1239. The Eleventh Circuit held that because "Atchison himself signed the mortgage on behalf of the corporation[,] even if he did own the equipment, his signature for A&W was sufficient to infer his consent to its use as collateral" on behalf of both parties. *Id.*

In the circumstances presented before this Court, Comerica argues that because Gary Luce—the chief executive officer and agent of both the Debtor and the Subsidiary—executed the Assignment [Finding of Fact No. 3], the Debtor was aware of and authorized the Subsidiary to make the Assignment. [Adv. Doc. No. 43, pp. 5–6, ¶¶ 12–17]. The Trustee opposes that argument as unsupported by the evidence and requests that additional discovery be allowed in order to prove that the Debtor did not consent. [Adv. Doc. No. 37, pp. 5–6, ¶¶ 11–14]. Based upon the well-reasoned opinions of *Whatley, Zurita, WL Homes,* and *Atchison*, this Court concludes that these circumstances signify a classic example of consent; additional evidence is not necessary.

First, Mr. Luce, the chief executive officer of the Subsidiary, executed the Assignment and all relevant documents on behalf of the Subsidiary. [Finding of Fact No. 3]. Second, it is

undisputed that Mr. Luce has, at all relevant times, served as the chief executive officer of both the Debtor and the Subsidiary.  [*Id.*].  As such, Mr. Luce is considered an agent of the Debtor as well as the Subsidiary and is entrusted with carefully wearing two different hats.  Mr. Luce's concurrent position is significant because courts have held that "[i]f the president, vice-president or director of a corporation has knowledge or notice of a fact, knowledge or notice of that fact is generally imputed to the corporation."  *In re WL Homes, LLC,* 452 B.R. 138, 147 (Bankr. D. Del. 2011) (quoting *In re Pubs, Inc. of Champaign,* 618 F.2d 432, 438 (7th Cir. 1980)); *see also Buchanan v. Reliance Ins. Co. (In re Color Tile Inc.),* 475 F.3d 508, 513 (3d Cir. 2007) ("Where an agent receives notice, that notice is imputed to the principal.") (citing *Am. Sur. Co. v. Pauly,* 170 U.S. 188, 153 (1898)).  Therefore, due to Mr. Luce's undisputed knowledge of the fact of the Assignment, even though he made such assignment wearing his Subsidiary CEO hat, this Court imputes knowledge—and therefore assent—of the Assignment to the Debtor itself.

Third, Mr. Luce's signature, even if made while purporting to wear his Subsidiary CEO hat, is further evidence of his consent to the Subsidiary's actions on behalf of the Debtor as well. The doctrine of apparent authority controls in situations such as these and operates as a way to justify Comerica's belief that Mr. Luce authorized the Assignment on behalf of the Subsidiary, while at the same time authorizing such actions of the Subsidiary on behalf of the Debtor. Apparent authority exists in Mr. Luce because the principal's (i.e., the Debtor's) manifestations to the third party—Comerica—is controlling and because the Debtor did not exercise ordinary care to dispel any appearance of authority in Mr. Luce.  In sum, the Debtor "clothed" its agent, Mr. Luce, with indicia of authority by making him CEO of both entities and by failing to notify Comerica that Mr. Luce did not have authority to consent to the Assignment on behalf of the Debtor.  Such apparent authority resulted in a reasonably prudent entity's (i.e., Comerica's)

belief that Mr. Luce had the capacity to execute and did consent to the Assignment on behalf of the Debtor as well. *See In re WL Homes*, 452 B.R. at 147–48 (holding that signing loan letters on behalf of one company is evidence of consent to such an arrangement on behalf of a second company due to the signatory's concurrent position as president of both). In sum, in light of Mr. Luce's position as chief executive officer of the Debtor and the Subsidiary, Comerica is justified in relying on the presumption that he had sufficient authority to consent to the Assignment.

Fourth, the Debtor's "Corporate Resolutions and Incumbency Certification: Authority to Procure Loans – Joint Borrowings" (the Resolutions) provide that Mr. Luce, as a CEO, is authorized to "[g]ive security for any liability of [the Debtor] and [the Subsidiary] to [Comerica] by grant, security interest, assignment, lien, or mortgage upon any real or personal property, tangible or intangible of [the Debtor]." [Adv. Doc. No. 43-1, p. 1, ¶ 1(d)]. The Debtor delivered the Resolutions to Comerica on October 14, 2011, and the Resolutions ratified the Assignment. [*Id.*, p. 1, ¶ 3].

### 2. The Debtor is Estopped from Denying the Creation of the Security Interest

In the alternative, and independent of the discussion in section III.C(1) of this Memorandum Opinion , the Subsidiary also holds sufficient "rights in the collateral" because the Debtor is estopped from denying the creation of such security interest on the grounds that the Debtor allowed the Subsidiary "to appear as the owner, or as having full power of disposition over the property, so that an innocent person is led into dealing with such apparent owner." *Zurita v. SVH-1 Partners, Ltd.*, No. 03–10–00650–CV, 2011 WL 6118573, at *5 (Tex. App.—Austin Dec. 8, 2011, pet. Denied); *see also Mori v. Chi. Nat'l Bank*, 120 N.E.2d 567, 568 (Ill. App. Ct. 1954) (The doctrine of estoppel "is based upon the conduct of the true owner, whereby he has allowed another to appear as the owner, or as having full power of disposition over the

18

property, so that an innocent person is led into dealing with such apparent owner."). Texas courts have held that "[t]he doctrine of estoppel will apply against the real owner of personal property where he clothes the person assuming to dispose of the property with the apparent title to it . . . . When one acts or parts with value or extends credit on the faith of such *apparent ownership* . . . he may invoke the equitable doctrine of estoppel." *Petroleum Anchor Equip., Inc. v. Tyra*, 410 S.W.2d 238, 245 (Tex. Civ. App.—Dallas 1966) (emphasis added), *rev'd on other grounds*, 419 S.W.2d 829 (Tex. 1967).

Mr. Luce's undisputed knowledge of the Assignment, even though he made the Assignment while wearing his Subsidiary CEO hat, imputes such knowledge to the Debtor (i.e., the parent corporation) because of Mr. Luce's dual capacity as the Debtor's chief executive officer. *See In re WL Homes, LLC,* 452 B.R. 138, 147 (Bankr. D. Del. 2011). Thus, the Debtor was aware that the Subsidiary appeared as the owner of the CD in the eyes of Comerica. Furthermore, the Debtor was aware that the Subsidiary asserted that it possessed the right to dispose of and assign the CD. In the face of such knowledge, the Debtor failed to act, remedy or even dispute such allegedly false assertion by the Subsidiary. These circumstances led Comerica to believe it was dealing with the legal title owner. The Debtor is now estopped from claiming otherwise.

### IV.   CONCLUSION

Privately-held corporations and subsidiaries having the same person as chief executive officer cannot play a "shell game" with assets that a bona fide lender, acting in good faith, has taken as collateral in exchange for extending financing. If this Court accepted the Trustee's argument, the Court would essentially be endorsing the principle of "Now you see it, now you don't." This, the Court will not do. Accordingly, the Court grants the Motion. A separate order

consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed this 22nd day of November, 2013.

Jeff Bohm
Chief United States Bankruptcy Judge